**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| FREDERICK JORDAN BATTS, | § | |
| (TDCJ-CID #1460809) | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-3655 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM AND OPINION**

The petitioner, Frederick Jordan Batts ("Batts"), seeks habeas corpus relief under 28 U.S.C. § 2254, challenging a 2007 state felony conviction for engaging in organized criminal activity. The respondent filed a motion for summary judgment, (Docket Entry No. 19), with a copy of the state court record. (Docket Entries Nos. 10-11). Batts has not filed a response.

Based on careful consideration of the pleadings, the record, and the applicable law, the court grants the respondent's motion and, by separate order, enters final judgment. The reasons are set out below.

**I.      Background**

A jury found Batts guilty of engaging in organized criminal activity, with an underlying offense of making a false statement to obtain credit. (Cause Number 1091244). On September 13, 2007, the jury sentenced Batts to serve a 25-year prison sentence. On April 5, 2009, Batts filed an application for state habeas corpus relief. The Texas Court of Criminal Appeals dismissed it on July 15, 2009 because Batt's direct appeal was still pending. *Ex parte Batts*, No. 72,306-01 (Docket Entry No. 16-26, p. 2).

The Court of Appeals for the Fourteenth District of Texas affirmed the conviction and sentence on November 17, 2009. *Batts v. State,* No. 14-07-00865-CR, 302 S.W.3d 419 (Tex. App. – Houston [14th Dist.] 2009, pet. ref'd). Batts did not file a petition for discretionary review (PDR) within 30 days after the appellate court issued its opinion.

In September 2010, Batts filed a second application for a state habeas corpus relief, in part seeking permission to file an out-of-time PDR. On March 9, 2011, the Texas Court of Criminal Appeals granted Batts's application for the limited purpose of allowing him to file an out-of-time PDR. *Ex parte Batts*, No. 72,306-02 (Docket Entry No. 16-27, p. 2). Batts filed a PDR, which that court refused on December 14, 2011. A motion for rehearing was denied on February 8, 2012. *Batts v. State*, PDR No. 0454-11, *see* Texas Court of Criminal Appeals Website, www.txcourts.gov/cca.

Batts filed another application for a state writ of habeas corpus, which the Texas Court of Criminal Appeals denied without written order on February 13, 2013. *Ex parte Batts*, No. 72,306-03 (Docket Entry No. 16-29, p. 2).

On December 13, 2013, this court received Batts's federal petition. (Docket Entry No. 1) Batts contends that he is entitled to relief for the following reasons:

    (1)    He was denied his Sixth Amendment right to counsel because trial counsel was "per se ineffective" for failing to prepare a defense or "participate in any manner of the proceedings."

    (2)    The evidence is legally insufficient to support his conviction.

    (3)    He is actually innocent.

    (4)    The trial court violated "T.C.C.P. 28.01" by conducting a pre-trial hearing on defense counsel's motion to withdraw without Batts present.

(5)     The trial court erred in admitting uncorroborated testimony

from accomplice witness Mehement Woldie.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 6-7; Docket Entry No. 2,

Memorandum, at 1-6).

Each ground for relief is examined below under the legal standards that apply.

## II.     The Statement of Facts

The Fourteenth Court of Appeals summarized the factual and procedural background.  That

lengthy summary is helpful and is set out below:

> Appellant's conviction stems from a mortgage fraud scheme
> allegedly engaged in by appellant and his seven co-defendants: James
> Evans (a real estate attorney), Meheret Woldie (a loan processor),
> Keith Wiltz (a real estate appraiser), Mohammad Asaduddin (a
> mortgage broker), Doris Wang and Viet Ba Nguyen (real estate
> agents), and Cistie Dixon. The indictment alleged that appellant and
> his co-defendants participated in a scheme to swindle WMC out of
> millions of dollars by obtaining fraudulently inflated home mortgage
> loans.  According to the State's witnesses, the conspiracy unfolded in
> the following manner: appellant owned two real estate investment
> companies, Dual Access and Assets Management of Texas Holding
> Company ("AMTHC").   Through Dual Access and AMTHC,
> appellant masterminded a complex mortgage scam to defraud WMC
> by: (1) contracting to buy property at market value from a
> homeowner, (2) entering into a second contract to sell the
> homeowner's property to a straw buyer at a price substantially above
> market value before actually purchasing the property from the
> homeowner, (3) to pay the original homeowner, taking out a
> mortgage loan in the name of the straw buyer using falsified loan
> applications and counterfeit documents, (4) using the proceeds
> wrongfully received from WMC to purchase the property from the
> original homeowner, and (5) splitting the remaining proceeds with
> other participants in the fraudulent scheme.
>
> As a result of appellant's fraudulent acts, WMC disbursed more funds
> that it otherwise would have loaned, allowing appellant to profit from
> the difference between the inflated loan amount and the market value
> of the property.  Furthermore, the straw buyer was typically left
> holding the property in his name and owing WMC the loan proceeds

appropriated by appellant and his co-defendants.  Appellant and his co-defendants appropriated over $2.2 million on 20 real estate properties.  At trial, the State focused on five properties: 707 Timber Cove Drive, 525 Arlington Street, 8614 Misty Sage Court, 8610 Amy Brook Court, and 20406 Long Cypress Drive.

Brian Dewhurst testified that he owned a home at 707 Timber Cove Drive and put the property on the market in 2005.  He listed Timber Cove at its fair market value: $266,000.00.  AMTHC subsequently agreed to purchase Timber Cove, and on April 6, 2005, Dewhurst signed a contract to sell Timber Cove to AMTHC for $262,000.00 cash.  The Timber Cove closing was set for the end of April, and appellant signed an earnest-money check on the sales contract.  Days after the Dewhurst–AMTHC contract, AMTHC entered into a second contract to sell Timber Cove to Larry Ransome.  Ransome testified that appellant talked to him about appellant's investment businesses, and appellant promised Ransome financial prosperity by drawing equity out of various residential properties.  Appellant explained that he would purchase a property below market value and then draw out the equity by reselling the property at market value to Ransome.  Ransome believed that appellant was offering a sound investment deal and agreed to purchase Timber Cove from AMTHC for $460,000.00.[2]  At the time AMTHC entered into the contract for sale with Ransome, the company did not own Timber Cove.

[2]     Dewhurst testified that he did not know that appellant had entered into a contract for sale with Ransome on Timber Cove.

Woldie testified that she and appellant then applied for a mortgage loan in Ransome's name.  Woldie testified that Ransome submitted a loan application with accurate information, but she and appellant subsequently manipulated the information by inflating his income and the value of his assets.  Woldie further testified that she and appellant generated counterfeit documents to support the falsified loan application.  Specifically, a counterfeit escrow receipt was created to reflect that earnest money was paid in escrow, a counterfeit title policy was created to reflect that AMTHC had authority from Dewhurst to sell Timber Cove to Ransome, and a counterfeit assignment of rights and notification was created to support the counterfeit title policy.  Woldie testified that she altered the loan application with false information and created the counterfeit title policy and assignment of rights at appellant's instruction.  She also testified that appellant forged the signatures of Ransome and

4

Dewhurst on the assignment of rights.   A falsified appraisal substantially exaggerating the value of Timber Cove was also generated to support the loan application.[3]  Ransome also testified that an affidavit of occupancy and financial status was fake and falsely reflected that Timber Cove would be used as his primary residence.   Shortly thereafter, the falsified loan application and supporting counterfeit documents were submitted to WMC for approval.

3.      Wiltz performed an appraisal valuing Timber Cove at approximately $462,000.00.     Wiltz's appraisal was purportedly performed on March 1, 2005, before AMTHC contracted with Dewhurst and Ransome.   Furthermore, the State's witness Deloris Lynn Kraft–Longoria, an investigator with the Texas Appraiser Licensing and Certification Board and a real estate appraiser, testified that the comparables included in Wiltz's appraisal to support the market value of $462,000.00 were not suitable comparables and Timber Cove was not accurately appraised at $462,000.00.

On April 27, 2005, AMTHC closed on Timber Cove with Dewhurst; however, AMTHC did not simultaneously disburse the balance owed to Dewhurst.  Accordingly, an amendment to extend the closing date to May 5, 2005 was executed by AMTHC.  Appellant signed an earnest money check for the extension.  On May 5, 2005, WMC funded Ransome's loan application and transferred $456,838.71 to First Colony.  First Colony then transferred $446,836.28 to AMTHC. The following day, AMTHC made a wire transfer in the amount of $253,903.74 to Allegiance Title Company, the settlement agent in the Dewhurst–AMTHC sale.  Appellant subsequently signed a check on AMTHC's bank account payable to Ransome in the amount of $49,914.28 with the notation "loan proceeds."  Thereafter, appellant signed and remitted checks to Ransome for the monthly mortgage payments on Timber Cove.  However, appellant eventually stopped paying, and Ransome was unable to continue the mortgage payments. Consequently, the bank foreclosed on Timber Cove in 2006.

### *525 Arlington Street*

Pineda Investments owned a house at 525 Arlington Street.  Adriana Pineda, executive vice president of Pineda Investments, testified that on behalf of Pineda Investments, she put the Arlington house on the market for sale in 2005 at its fair market value: $250,000.00.  On May 11, 2005, AMTHC agreed to purchase Arlington and entered into a contract for sale to purchase Arlington from Pineda Investments.   The agreed-upon price was $235,000.00 cash. Appellant signed a check drawn on the AMTHC bank account in the amount of $1,000.00 for earnest money on the contract.

Shortly thereafter, AMTHC entered into a second contract to sell Arlington to Philip Askew.  Askew testified that appellant asked him, as a favor, to purchase Arlington in Askew's name.   Appellant explained that he had intended to use Arlington for his jewelry business with a "silent partner."  However, the purchase and business plan had fallen through when the silent business partner did not purchase the property.  Appellant told Askew that he had secured a discounted price on Arlington and did not want to pass on such a good buy.   Appellant promised that he would pay the taxes, mortgage, and maintenance on the property.   Appellant further promised Askew that he would purchase Arlington back from Askew within six months.  In exchange for using Askew's name and credit, appellant offered Askew the equity in the house, which, according to appellant, was $40,000.00.  Askew agreed and entered into a contract to purchase Arlington from AMTHC for $575,000.00.  AMTHC did not own the property at the time it entered into the contract with Askew. The contract was later amended, reducing the sales price to $500,000.00.[4]

[4]      Neither of the contracts between AMTHC and Askew required earnest money.

Woldie testified that she and appellant then applied for a mortgage loan in Askew's name.  Woldie testified that Askew submitted a loan application with accurate information, but she subsequently manipulated the information by inflating his income and the value of his assets.   Woldie further testified that she generated counterfeit documents to support the falsified loan application, including forged leases reflecting that Askew was receiving monthly rents from property he owned and an assignment of rights and notification falsely reflecting that AMTHC had authority to sell Arlington on behalf of Pineda Investments.[5]  Woldie observed appellant forge

Adriana Pineda's signature on the assignment of rights. Adriana Pineda also testified that her signature was forged on the assignment of rights and notification. Woldie further testified that she altered the loan application with false information and created the counterfeit documents at appellant's instruction. A falsified appraisal substantially exaggerating the value of Arlington was also generated to support the loan application.[6] Shortly thereafter, the falsified loan application and supporting counterfeit documents were submitted to WMC for approval.

5.     Askew did not execute the leases and testified that he did not own one of the properties subject of a lease at the time the lease was purportedly executed. Another counterfeit lease purported to lease residential property to appellant's employee, Lawrence Williams.

6.     Wiltz performed an appraisal valuing Arlington at approximately $580,000.00. Kraft–Longoria, an expert real estate appraiser, testified that the comparables included in Wiltz's appraisal to support the market value of $580,000.00 were not suitable comparables and Arlington was not accurately appraised at $580,000.00.

WMC ultimately funded Askew's loan application and transferred $498,893.11 to First Colony, the settlement agent. First Colony then wired $485,355.46 to AMTHC. AMTHC closed on Arlington with Pineda Investments.[7] Askew later received a bank wire from AMTHC in the amount of $40,000.00. Thereafter, appellant made no mortgage payments and never purchased the property back from Askew.

7.     Appellant was present at closing.

### *8614 Misty Sage Court*

Asher and Sandra Griffin owned a house at 8614 Misty Sage Court. The couple put the property on the market for sale in 2005, and on May 10, 2005, they entered into a contract to sell Misty Sage to AMTHC for $400,000.00 cash.[8]  Appellant signed an earnest-money check drawn on the AMTHC bank account in the amount of $3,000.00.   Days after the Griffin–AMTHC contract, AMTHC entered into a second contract to sell Misty Sage to Tommie Nicholson.  Nicholson testified that he believed he was entering into a valid investment agreement with appellant by purchasing Misty Sage.  Similar to Ransome, appellant promised Nicholson financial prosperity by drawing equity out of residential properties.  Appellant explained that he would purchase Misty Sage below market value and then draw out the equity by reselling the property at market value to Nicholson.   Based upon appellant's representations, Nicholson believed appellant's offer was a sound investment and agreed to purchase Misty Sage from AMTHC for $575,000.00.[9]

[8]     Cistie Dixon signed the contract for sale on behalf of AMTHC.

[9]     At the time AMTHC entered into the contract for sale with Nicholson, the company did not own Misty Sage.  Dixon also signed this contract on behalf of AMTHC.  The Griffins testified that they did not know that AMTHC had entered into a contract with Nicholson to sell Misty Sage.  Furthermore, Nicholson testified that he had no knowledge about the previous contract for sale between AMTHC and the Griffins.

Woldie testified that she and appellant then applied for a mortgage loan in Nicholson's name.  Woldie testified that Nicholson submitted a loan application with accurate information, but she subsequently manipulated the information by inflating his income and the value of his assets.  Woldie further testified that she and appellant generated counterfeit documents to support the falsified loan application. Specifically, a counterfeit escrow receipt was created to reflect that earnest money had been deposited into escrow.  Also generated were a counterfeit lease reflecting that Nicholson was receiving monthly rents from property he owned,[10] a falsely obtained special warranty deed reflecting that AMTHC had authority from the Griffins to sell Misty Sage, and a counterfeit assignment of rights and notification purporting to give AMTHC authority to sell Misty Sage.  Woldie testified that she altered the loan application with false information

and created counterfeit documents at appellant's instruction.  She also
testified that appellant forged the signatures on the assignment of
rights.  A falsified appraisal substantially exaggerating the value of
Misty Sage was also generated to support the loan application,
valuing the property at $584,000.00.[11]  Nicholson also testified that
his signature was forged on the assignment of rights and on one of the
loan applications.  Shortly thereafter, the falsified loan application
and supporting counterfeit documents were submitted to WMC for
approval.

[10].     Nicholson testified that he did not execute the counterfeit
lease and that his signature was forged.

[11].     Wiltz performed the exaggerated appraisal on Misty Sage.
Kraft–Longoria testified that the comparables included in
Wiltz's appraisal to support the market value of $584,000.00
were not suitable comparables and that Misty Sage was not
accurately appraised at $584,000.00.

WMC funded Nicholson's loan application and transferred
$571,977.25 to First Colony, the settlement agent.  First Colony then
wired $559,515.47 to AMTHC.  AMTHC closed on Misty Sage with
the Griffins, paying the balance of $383,537.04.  Nicholson later
received a bank wire from AMTHC in the amount of $91,489.00.
Upon the Nicholson–AMTHC closing, Nicholson moved into Misty
Sage.  However, he subsequently was unable to continue making the
mortgage payments, and the bank foreclosed on the property.

### *8610 Amy Brook Court*

Nicholson also entered into a contract with AMTHC to purchase a
home located at 8610 Amy Brook Court.  Amy Brook was built in or
around 2004 and was placed on the market at $400,000.00.  The
following year, James and Suzanne Armstrong acquired Amy Brook
at a steep discount, purchasing it for $300,000.00.  However, the
Armstrongs put the home back on the market for $360,000.00 two
weeks after they purchased it.

On June 22, 2005, Nicholson entered into a contract with AMTHC to
purchase Amy Brook for $515,000.00.[12]  Nicholson then signed a
second contract on Amy Brook agreeing to purchase the property at
a higher price—$550,000.00.  The contract represented that AMTHC

9

was selling Amy Brook as assignee of the Armstrongs.  However, AMTHC never had the authority to sell Amy Brook on behalf of the Armstrongs.  On June 28, 2005, AMTHC entered into a contract with the Armstrongs to purchase Amy Brook for $360,000.00 cash. Appellant signed an earnest-money check in the amount of $3,000.00 drawn on the AMTHC bank account.  The following day, Wiltz fraudulently appraised the property at $553,000.00.[13]  Nicholson testified that he believed he was entering into a valid investment agreement with appellant by purchasing Amy Brook.

[12]    Dixon signed the contract for sale on behalf of AMTHC.

[13]    Wiltz performed the exaggerated appraisal on Amy Brook as well.  Kraft–Longoria testified that the comparables included in Wiltz's appraisal to support the market value of $553,000.00 were not suitable comparables and Amy Brook was not accurately appraised at $553,000.00.

Woldie testified that she and appellant applied for a mortgage loan in Nicholson's name.  Woldie testified that Nicholson submitted a loan application with accurate information, but she subsequently manipulated the information by inflating his income and the value of his assets.  Woldie further testified that she and appellant generated counterfeit documents to support the falsified loan application.  A counterfeit assignment of rights reflecting that AMTHC had authority from the Armstrongs to sell Amy Brook was generated and submitted to WMC.  Additionally, a counterfeit special warranty deed with a vendor's lien was submitted to WMC also purporting to give AMTHC authority to sell Amy Brook on behalf of the Armstrongs. Woldie testified that she altered the loan application with false information and created the counterfeit assignment of rights at appellant's instruction.  She also testified that appellant forged the signatures on the assignment of rights.  Nicholson testified that his signature was forged on the assignment of rights and on one of the loan applications.   Wiltz's falsified appraisal substantially exaggerating the value of Amy Brook was also submitted to support the loan application. Shortly thereafter, the falsified loan application and supporting counterfeit documents were submitted to WMC for approval.

WMC ultimately funded Nicholson's loan application and transferred $571,977.25 to First Colony.  First Colony then wired $559,515.47

10

to AMTHC.  AMTHC closed on Amy Brook with the Armstrongs, paying the balance of $345,715.72.  Nicholson later received a bank wire from AMTHC for approximately $83,000.00, but gave $40,000.00 back to appellant.  Thereafter, Nicholson was unable to continue making the mortgage payments, and the bank foreclosed on Amy Brook.

### *20406 Long Cypress Drive*

Deutsche Bank National Trust owned 20406 Long Cypress Drive in 2005.  Derrick Williams testified that he entered into a contract with AMTHC to purchase Long Cypress as an investment.  Williams testified that he was approached by Tina Pick, whom he had met through a friend.  Pick asked Williams to purchase Long Cypress in his name and to resell it back to her the following year.  Pick told Williams that she was unable to purchase the home with her credit and wanted to use Williams's name and credit to acquire Long Cypress.  Pick promised that she would rent the property for a year and pay the mortgage payments.  Pick also offered Williams $20,000.00 for use of his credit and assured Williams that she would purchase the property from him within a year.

Williams agreed and entered into a contract for sale with AMTHC to purchase Long Cypress for $260,000.00.[14]   Williams's loan information was gathered and submitted to WMC.  Woldie testified that she generated a fake lease reflecting that Williams was receiving monthly rental income on residential property he owned.  Williams testified that unbeknownst to him, his income and the value of his assets had been substantially inflated on his loan application.  Williams also testified that a counterfeit occupancy and financial status affidavit submitted to WMC falsely represented that he intended to use Long Cypress as his primary residence, when in fact it was purchased for investment purposes.  A counterfeit assignment of rights and notification was submitted to WMC, falsely reflecting that AMTHC was assignee for Deutsche Bank to sell Long Cypress to Williams.  Williams testified that his signature was forged on the assignment of rights.  Based upon this and other false information, WMC approved the loan, and Williams closed on Long Cypress.

14.     Dixon signed on behalf of AMTHC.

Appellant signed a check on the AMTHC bank account payable to Pick in the amount of $30,214.10.  In turn, Pick paid Williams $17,500.00 for use of his credit.  Pick moved into Long Cypress, but she made only one payment and eventually left the property. Williams subsequently learned that title to the Long Cypress was never transferred in his name but remained in the seller's name. Apparently, First Colony failed to file Williams's deed with the county.  At the time of trial, Long Cypress was in foreclosure.

As the properties were foreclosed, appellant's scheme began to collapse.  Harris County District Attorney's Office opened an investigation into the activities of appellant and his two real estate companies.  The district attorney's office learned that the scheme included a number of people, some of whom were prosecuted and some of whom were not.  Appellant and his seven co-defendants were ultimately charged by felony indictments for their participation in creating and using false information to obtain mortgage loans from WMC, defrauding WMC out of over $2.2 million.  Appellant was ultimately found guilty and sentenced to 25 years in prison.

*Batts v. State*, 302 S.W.3d at 423-429.

## III.    The Applicable Legal Standards

Batts's petition for a writ of habeas corpus is reviewed under the federal habeas statutes as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C. § 2254; *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002).

The AEDPA provides:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

12

> (e)(1)  In a proceeding instituted by an application for a  writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Subsections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact, questions of law, and mixed questions of fact and law that result in an "adjudication on the merits."  An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case is substantive, as opposed to procedural."  *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000).  A state-court determination of questions of law and of mixed questions of law and fact is reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000).  A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result.  *Williams v. Taylor,* 120 S. Ct. 1495 (2000).

A state court unreasonably applies Supreme Court precedent if: (1) it unreasonably applies the correct legal rule to the facts of a particular case; or (2) it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Id.* at 1495.  In deciding whether a state court's application was unreasonable, a federal court considers whether the application was "objectively unreasonable."  *Id.* at 1495; *Penry v. Johnson,* 215 F.3d 504, 508 (5th Cir. 2000).

The state court's factual findings are "presumed to be correct . . . and [receive] deference . . . unless it 'was based on an unreasonable determination of the facts in light of the evidence presented

13

in the State court proceeding.'" *Hill,* 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).  In addition, a state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under 28 U.S.C. § 2254(e)(1), unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman,* 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)).  This deference extends not only to express factual findings, but also to the state court's implicit findings.  *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)).

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules.  Section 2254(e)(1) — which mandates that findings of fact made by a state court are "presumed to be correct" — overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party.  Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence," the state court's findings of fact must be accepted as correct. *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002).

Batts filed his petition for a writ of habeas corpus *pro se* and currently is without counsel.[1] *Pro se* habeas petitions are construed liberally and are not held to the same standards as lawyers' pleadings.  *See Martin v. Maxey,* 98 F.3d 844, 847 n.4 (5th Cir. 1996); *Guidroz v. Lynaugh*, 852 F.2d 832, 834 (5th Cir. 1988); *Woodall v. Foti,* 648 F.2d 268, 271 (5th Cir. Unit A June 1981).  This court

---

[1]    Attorney Uriel Lawrence Boze filed a Notice of Appearance (Docket Entry No. 20) after the Respondent filed his motion for summary judgment.  Boze filed a subsequent Motion to Withdraw which the Court granted.  (Docket Entry No. 28).

broadly interprets Batts's state and federal habeas petitions. *Bledsue v. Johnson,* 188 F.3d 250, 255 (5th Cir. 1999).

## IV.     The Claim of Ineffective Assistance of Counsel

Batts alleges that his trial counsel, Craig Washington, failed to: question or cross-examine a state witness; call another witness for the defense; raise an objection; or make a closing argument. (Petitioner's Memorandum, Docket Entry No. 3, p. 1).  Batts also alleges that Washington was absent in all pretrial matters and did not file any motions, discovery or subpoenas. *Id.*  Batts asserts that the only action Washington took was to file a motion to withdraw over a fee dispute. *Id.* at 2. Batts claims that the trial court refused to allow the withdrawal because it as filed shortly before the trial setting. *Id.*  Batts argues that the "trial court record unequivocally shows that trial counsel stood entirely [mute]" and that it is not necessary for Batts to prove that his defense was prejudiced by Washington's deficient performance because Washington was "not functioning at all." *Id.*

### A.     The Standard for Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel at trial.  U.S. CONST. amend. VI; *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).   Claims for ineffective assistance of counsel are analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984).  A defendant must demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result. *See Williams*, 529 U.S. at 390-91.  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that rendered the result unreliable." *Strickland*, 466 U.S. at 687.

The first prong is satisfied if the defendant shows that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687.  Scrutiny of counsel's performance is "highly deferential" and requires the reviewing court "to eliminate the distorting

15

effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  To prove prejudice, a defendant must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

"Claims of ineffective assistance of counsel involve mixed questions of law and fact and are governed by § 2254(d)(1)." *Clark v. Thaler*, 673 F.3d 410, 416 (5th Cir. 2012).  The petitioner has the burden of proving that his lawyer was ineffective.  *Id.*; *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002).  In the state habeas context, the petitioner must show that the state court's decision that petitioner failed to show ineffective assistance was contrary to or an unreasonable application of the *Strickland* standard.  *Charles v. Thaler*, 629 F.3d 494, 501 (5th Cir. 2011) (citing *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003).  Because a court's review of  an attorney's performance is "highly deferential," with a strong presumption of adequate performance, *McAfee v. Thaler*, 630 F.3d 383, 394 (5th Cir. 2011), it is difficult to meet the *Strickland* requirements.  *Harrington*, 131 S.Ct. at 788.

### B.     The State Habeas Court Findings

In his state habeas application, Batts alleged that his defense counsel, Washington, failed to investigate facts and introduce evidence, object to "bald assertions" by the State, object to the court's jurisdiction, interview witnesses for the defense, or prepare for trial or discuss strategy with Batts. State writ application (Docket Entry No. 16-29 p. 13).  At trial, according to Batts, Washington offered no evidence, required no proof, subpoenaed no witnesses, made no pleas, and made no opening statement.  *Id.*

The state district court entered the following findings and conclusions and recommended denying habeas relief.

   . . .

2.     The applicant fails to allege existent facts, which if true, would entitle him to relief. *Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985); *Ex parte Young*, 418 S.W.2d 824 (Tex. Crim. App. 1967) (holding conclusory allegations are not enough to warrant habeas relief); and *Ex parte Empey*, 757 S.W.2d 771, 775 (Tex. Crim. App. 1988) (holding conclusory allegations, even if sworn to, are insufficient to overcome the State's denials).

3.     The applicant fails to show that the conduct of counsel fell below an objective standard of reasonableness and that, but for counsel's alleged deficient conduct, there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986) (adopting the *Strickland* standard in Texas); *Navariz v. State*, 840 S.W.2d 415, 434 (Tex. Crim. App. 1992) (defining the two-part *Strickland* standard)); *Ex parte Butler*, 884 S.W.2d 782, 783 (Tex. Crim. App. 1994) (two part appellate standard mirrors that of *Strickland*).

4.     The applicant does not show what a more in depth investigation would have shown. *Mooney v. State*, 817 S.W.2d 693 (Tex. Crim. App. 1991).

5.     Even assuming, *arguendo*, that defense counsel limited his investigation, an attorney's decision to limit his investigation may be reasonable under the circumstances. *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir.), cert. denied, 110 S.Ct. 573 (1989); *Butler v. State*, 716 S.W.2d 48, 54 (Tex. Crim. App. 1986).

6.     The applicant has not overcome the presumption that defense counsel conducted a proper investigation. *Strickland*, 466 U.S. at 691.

7.     An isolated failure to object generally does not in itself constitute ineffective assistance [of counsel]. *See Bridge v. State*, 726 S.W.2d 558 (Tex. Crim. App. 1986).

8.     The applicant does not show that the trial judge would have committed error in overruling the objection if it were made. *Vaughn v. State*, 931 S.W.2d 564 (Tex. Crim. App. 1996).

9.     The applicant fails to prove that a motion would have been granted in order to satisfy *Strickland*. *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998).

10.     The applicant fails to list the names of the alleged witnesses that counsel allegedly failed to interview, and the applicant fails to meet his burden of showing not only that they were available, but how their testimony would have benefitted the applicant. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983); *Wilkerson v. State*, 726 S.W.2d 542, 551 (Tex. Crim. App. 1986).

11.     The court will not use hindsight to second-guess a tactical decision made by trial counsel, nor will the fact that another attorney might have pursued a different course support a finding of ineffectiveness. *Solis v. State*, 792 S.W.2d 95, 100 (Tex. Crim. App. 1990).

. . .

19.     The totality of the representation afforded the applicant was sufficient to protect the applicant's right to reasonably effective assistance of counsel.

. . . .

State's Proposed Findings of Fact, Conclusions of Law and Order (Docket Entry No. 61-30, pp. 39-43).

### C.     The Trial Record Supports the State Court's Decision

The court has reviewed the lengthy trial transcript.  It rebuts Batts's statement that Washington failed to "participate in any manner of the proceedings."  The transcript shows that before trial, Washington filed a motion *in limine*, seeking court orders prohibiting the prosecution from making sidebar comments and instructing the prosecution to confine its objections to concise grounds.  (Docket Entry No. 10-9, pp. 35-36).  Washington also filed a motion *in limine* seeking an order instructing the prosecution and witnesses to refrain from mentioning any of Batts's prior convictions.  *Id.* at 38-40.  In addition, Washington filed a motion for an order allowing Batts to

testify free from impeachment under the Texas Rules of Criminal Evidence.  (Docket Entry No. 10-10, pp. 1-5).

The transcript also shows that, contrary to Batts's allegations, Washington spoke with and questioned the juror panel at length during the *voir dire* examination.  (Docket Entry No. 10-25, pp. 2-58)  Washington also cross-examined the many State witnesses, including: John Fleming, General Counsel for the Texas Department of Savings and Mortgage Lending (Docket Entry No. 10-26, pp. 66-81, Docket Entry No. 10-27, pp. 1-59, 143-151); former home owner Brian Dewhurst (Docket Entry No. 10-29, pp. 50-77); former home owners Asher and Sandra Griffin (Docket Entry No. 10-32, pp. 35-52, 56-58, 73-81); home buyer Larry Ransome (Docket Entry No. 10-34, pp. 9-31; Docket Entry No. 10-35, pp. 4-10); home buyer James Armstrong (Docket Entry No. 10-35, pp. 46-73; Docket Entry No. 10-36, pp. 10-15); home buyer Phillip Askew (Docket Entry No. 10-37, pp. 13-48); loan applicant Tommie Nicholson (Docket Entry No. 10-38, pp. 45-55); house purchaser Derrick Williams (Docket Entry No. 10-38, pp. 86-102, 108-110, 111); real estate appraiser Randall Redd (Docket Entry No. 10-39, pp. 26-55; Docket Entry No. 10-40, pp. 12-30); real estate agent Doris Wang (Docket Entry No. 10-41, pp. 78-106; Docket Entry No. 10-42, pp. 1-50; Docket Entry No. 10-43, pp. 6-7); Texas Real Estate Appraisal Board Investigator Doloris Lynn Kraft-Longoria (Docket Entry No. 10-43, pp. 48-100; Docket Entry No. 10-44, pp. 1-25); title insurance expert Bob Philo (Docket Entry No. 10-44, pp. 62-82); attorney and vice president of WMC Mortgage  Sharon Mason (Docket Entry No. 10-45, pp. 25-41; Docket Entry No. 10-46, pp. 4-92); loan processor Meheret Woldie (Docket Entry No. 10-47, pp. 21-93; 10-48, pp. 1-55; Docket Entry No. 10-50, pp. 23-31, 35-37); attorney/state fraud examiner George Jordan (Docket Entry No. 10-49, pp. 64-103; Docket Entry No. 10-50, pp. 1-13); investigator John Kleindienst (Docket Entry No. 10-50, pp. 41-47).

In addition, the trial transcript reflects that Washington made numerous objections throughout the trial. The trial court sustained many of them. *See, e.g.,* (Docket Entry No. 10-33, pp. 40. 47, 61, 67, 78, 82, 85, 94; Docket Entry No. 10-36, pp. 2, 5; Docket Entry No. 10-38, pp. 43, 105; Docket Entry No. 10-40, pp. 7, 12; Docket Entry No. 10-41, pp. 4, 7, 15, 27, 33, 177; Docket Entry No. 10-49, p. 64; Docket Entry No. 10-50, pp. 15, 118, 148; Docket Entry No. 11-3, pp. 16, 31, 34). And, contrary to Batts's allegations, Washington made the closing argument at the end of the guilt-innocence proceedings. (Docket Entry No. 11-1, pp. 13-39). Although Washington called no defense witnesses during the guilt-innocense phase, he did call four witnesses during the punishment phase. (Docket Entry No. 11-2, pp. 8-74; Docket Entry No. 11-3, pp. 1-15). And Washington made a closing argument during punishment phase, in which he noted Batts's age (he was 63 years old) and his family's support. (Docket Entry No. 11-3, pp. 18-27).

**D.     Analysis**

The record shows no factual support for Batts's allegations that Washington did not "participate in any manner of the proceedings." Batts's conclusory arguments fail to show that the state court was unreasonable in determining that he received effective assistance of counsel. *See Knowles v. Mirzayance*, 556 U.S. 111, 112-113 (2009).

Batts alleges that Washington failed to make any objections. Batts does not specify what objections should have been made or how they would have helped his defense. Defense counsel is not obligated to make futile objections. *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) (citing *Clark v. Collins,* 19 F.3d 959, 966 (5th Cir.1994) ("[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite."); *see also Koch v. Puckett,* 907 F.2d 524, 527 (5th Cir.1990) ("This Court has made clear that counsel is not required to make futile motions or objections.")). Refraining from objecting when counsel knows it will be overruled and will only

20

serve to provoke the judge and the jury is essential to effective trial advocacy. *Id.* Batts neither identifies nor presents evidence showing that Washington was deficient in not raising objections and he makes no showing that the failure to object prejudiced the defense. *See Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008).

Batts also alleges that Washington "never called any witnesses for the defense." (Docket Entry No. 2, p. 1). Washington called four witnesses during the punishment stage. There is no basis to find Washington deficient for failing to call witnesses during the guilt-innocence phase. Claims of uncalled witnesses are not favored in habeas. A petitioner must show that witnesses were available and would have provided favorable testimony. *Gregory v. Thaler*, 601 F.3d 347, 352 -353 (5th Cir. 2010) (citing *Harrison v. Quarterman,* 496 F.3d 419, 428 (5th Cir.2007)). The record shows that Batts failed to meet his burden of showing not only that the witnesses were available, but how their testimony would have benefitted his defense. There is no support for finding that the state court's determination that Washington was deficient in failing to call witnesses for this phase of the trial. *Rabe v. Thaler*, 649 F.3d 305, 310 (5th Cir. 2011). Nor is there support for finding that the state court unreasonably applied the *Strickland* standard.

Batts alleges that Washington failed to file any pretrial motions, but the record shows that several motions were filed. Again, Batts fails to specify what motions should have been filed and whether they would have mattered. The record does not show that Washington failed to file a motion that would have benefitted the defense. *Ward v. Dretke,* 420 F.3d 479, 488 (5th Cir. 2005). Washington was not obligated to raise every plausible defense argument or file every possible motion, regardless of its merit. *See Dorsey v. Stephens*, 720 F.3d 309, 320 (5th Cir. 2013); *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) ("Counsel is not required to engage in the filing of

futile motions."). Batts has failed to demonstrate that the state court was unreasonable in rejecting the argument that Washington provided ineffective assistance by failing to file unspecified motions.

In general, the state-court record shows that Washington followed a reasonable trial strategy based on the law and facts of the case. *See Pape v. Thaler*, 645 F.3d 281, 289 (5th Cir. 2011) (citing *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir.1994)). The state court found that Batts failed to show that his attorney was ineffective. *See Clark*, 673 F.3d at 416; *Galvan*, 293 F.3d at 764. Batts has not shown that the state court finding was contrary to, or an unreasonable application of, *Strickland*. The record supports the finding. *See Charles*, 629 F.3d at 501. Batts is not entitled to relief on his claim that he was denied effective assistance of counsel at trial. *Harrington*, 131 S.Ct. at 788.

## V.    The Claim that the Evidence Was Legally Insufficient

A federal habeas court assessing an insufficiency of the evidence claim must determine "whether, after viewing the evidence in light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). "All credibility choices and conflicting inferences are to be resolved in favor of the verdict." *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) (quoting *United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999). The habeas court considers both direct and circumstantial evidence. *United States v. Martinez*, 578 F. App'x 362, 362 (5th Cir. 2014); *Schrader v. Whitley*, 904 F.2d 282, 287 (5th Cir. 1990) (*Jackson* applies to both direct and circumstantial evidence).

Batts argued on direct appeal that the evidence was insufficient to support his conviction. *Batts,* 302 S.W.3d at 423. The Fourteenth Court of Appeals found there was sufficient evidence and rejected Batts's claim. "When one reasoned state court decision rejects a federal claim, subsequent

unexplained orders upholding that judgment or rejecting the same claim are considered to rest on the same ground as did the reasoned state judgment." *Bledsue v. Johnson,* 188 F.3d 250, 256 (5th Cir. 1999).  The federal habeas court "looks through" the later "unexplained state court denial and evaluate[s] the last reasoned state court decision." *Id.; see also Renz v. Scott,* 28 F.3d 431, 432 (5th Cir. 1994) (finding that the denial of relief "on the findings of the trial court" by the Texas Court of Criminal Appeals adopts an express finding by the trial court that a claim was procedurally barred from habeas review); *Ylst v. Nunnemaker,* 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

The Texas Fourteenth Court of Appeals wrote a detailed and reasoned opinion.  This court evaluates that opinion.  *Ylst,* 501 U.S. at 803; *Woodfox v. Cain*, 772 F.3d 358, 369 (5th Cir. 2014). The Fourteenth Court applied the *Jackson* standard and entered the following findings and conclusions:

> A defendant commits the offense of engaging in organized criminal activity if, intending to establish, maintain, or participate in a combination or in the profits of a combination, he commits or conspires to commit the felony offense of making a materially false or misleading written statement to obtain credit, including a mortgage loan.  *See* Tex. Penal Code §§ 71.02(a)(8), 32.32(b).  On appeal, appellant challenges the sufficiency of the evidence on the underlying offense of making a false or misleading written statement to obtain the mortgage loans involved in the case.  Appellant essentially argues that the evidence proved the existence of mortgage fraud, but fell short of proving that appellant, himself, knowingly and intentionally made false or misleading statements to WMC to obtain the mortgage loans.  He cites to the following evidence: (1) two homeowners, Dewhurst and Armstrong, had no dealings with appellant; (2) the evidence did not establish that appellant owned or managed AMTHC; (3) the evidence did not establish that any of the fraudulent proceeds were transferred to appellant's personal bank account; (4) there is no evidence that AMTHC's bank account was in fact appellant's bank account; (5) the incriminating documents, i.e., the falsified appraisals and falsified loan application and other documents, were not in

23

appellant's possession; and (6) Asaduddin and Woldie, two other co-defendants, worked independently from appellant and were responsible for the loan-application process. According to appellant, this evidence does not sufficiently prove that he knowingly and intentionally altered the appraisals, loan applications, and other documents used to obtain inflated mortgage loans from WMC.

Contrary to appellant's contention, the evidence was legally and factually sufficient to sustain his conviction. At trial, the State produced sufficient evidence that appellant and his co-defendants applied for inflated mortgages on behalf of buyers and submitted loan applications and other documentation containing false and misleading information about the buyers' current residence, employment, income, assets, and existing debt. There was evidence of WMC's reliance on these false statements in approving loans that it would otherwise have denied. Woldie, a key witness against appellant and participant in the scheme, provided testimony directly linking appellant to the combination and averred that appellant was the mastermind behind the scheme. Woldie testified that appellant instructed her to increase the incomes of the straw buyers on their loan applications and to create counterfeit documents to support the increased incomes so that the loans would be approved. Doris Wang corroborated Woldie's testimony, indicating that AMTHC had a computer program to create counterfeit documents and that she heard appellant ask Woldie to create bank statements fraudulently increasing a straw buyer's income. Each of the straw buyers testified at trial that the loan documents contained false income information and that they did not submit the false statements. Woldie testified that she and appellant forged the signatures of the straw buyers on the loan applications.

Additionally, Woldie testified that appellant forged the signatures of the original homeowners on the assignment of rights and notification forms so that AMTHC could sign documents for the original sellers as their assignee and to ensure that AMTHC would receive the loan proceeds from WMC. She testified that she took the contracts bearing the original sellers' signatures to appellant, and he used the documents as an example to forge the original sellers' signatures on the assignment forms. Woldie further testified that she personally observed appellant forge the signatures of Brian Dewhurst, Adriana Pineda, James and Suzanne Armstrong, and Asher and Sandra Griffin. These original sellers confirmed that their signatures had been forged.

The State also produced evidence that appellant and his co-defendants sought mortgages on properties at values greatly in excess of the properties' actual sale prices or fair market values. To support applications for loans in excess of the properties' market values, appellant and his co-defendants procured artificially inflated appraisals. Using these false and misleading appraisals, appellant obtained loans in excess of the actual sale value of the property. The record reflects that appellant compensated Wiltz for grossly overstating the value of the properties in the appraisals. Doris Wang testified that appellant used only Wiltz to do appraisals. Wiltz would comply with appellant's request for appraisal in a certain amount. Appellant signed approximately 21 checks payable to Wiltz for his appraisals. These appraisals were submitted to WMC to support the falsified loan applications.

The State further produced evidence that appellant masterminded the mortgage fraud scheme which formed the basis of the indictment and ultimately appellant's conviction. Woldie testified that appellant caused her and other co-defendants to conduct certain fraudulent acts to promote the overall mortgage fraud scheme. Woldie's testimony was corroborated with other documentary and testimonial evidence. The straw buyers, most of whom were falsely promised that the properties were investments and that appellant would find tenants, and use the rent to pay the mortgages, testified that appellant managed the scheme. Appellant enticed the buyers with "no money down" promises and compensation for their participation. Appellant signed checks drawn on the AMTHC bank account to complete the fraudulent real estate transactions. Appellant wrote the earnest-money checks for the properties, the checks for the loan proceeds to the straw buyers, and the checks for the mortgage payments. Further, AMTHC, appellant's company, was an active participant in the fraudulent scheme. Appellant represented to the straw buyers that AMTHC was his business. Appellant handled and controlled AMTHC's finances and the flow of funds in the AMTHC bank account. Appellant also signed checks for his personal use from the AMTHC account. Furthermore, the WMC loan proceeds were consistently wired to AMTHC before being disbursed to co-defendants and other participants.

Based on the foregoing testimonial and documentary evidence, we find that the evidence was legally and factually sufficient to sustain the verdict.

*Batts*, 302 S.W.3d at 434-436.

The Texas Court of Criminal Appeals refused Batts's PDR.  (PDR No. 0454-11).  This court defers to the state court's determination.  *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005); *Miller*, 200 F.3d at 286.

Applying the *Jackson* standard to the facts of this case, a reasonable fact finder could have found Batts guilty beyond a reasonable doubt.   Batts has failed to rebut the presumed correctness of the state court's factual finding.  The record provides no evidence that the state habeas court was unreasonable in rejecting Batts's insufficient evidence claim.  Batts is not entitled to habeas relief on this ground.

## VI.     The Actual Innocence Claim

Actual innocence is not an independently cognizable federal-habeas claim.   *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006) (citing *Dowthitt v. Johnson,* 230 F.3d 733, 741-42 (5th Cir. 2000)); *see also Graves v. Cockrell,* 351 F.3d 143, 151 (5th Cir. 2003).   A claim of actual innocence is "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Dowthitt*, 230 F.3d at 741 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993).  Batts claims that he is actually innocent of the crime.  The record supports the state court's findings that the evidence was sufficient to support the finding of guilt. Batts has failed to show factual innocence, let alone that his claim of actual innocence is cognizable. Batts's free-standing claim of actual innocence has no basis in the record of his case or in the case law.  *United States v. Fields*, 761 F.3d 443, 479 (5th Cir. 2014) (citing *Dowthitt*, at 230 F.3d 741). He is not entitled to relief on this ground.

**VI.     The Claim that the Trial Court Erred in Conducting a Hearing on Defense Counsel's Motion to Withdraw**

Batts argues that he is entitled to habeas relief because the trial court conducted a pretrial hearing, outside Batts's presence, on Washington's motion to withdraw as Batts's defense counsel. Batts asserts that the hearing violated Article 28.01 of the Texas Code of Criminal Procedure.  But "federal habeas corpus relief does not lie for errors of state law."  *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67 (1991) (internal cites omitted). Batts alleges a state statutory violation, not a constitutional violation.  *See Lawrence v. Lensing,* 42 F.3d 255, 258 (5th Cir.1994) ("A state prisoner seeking federal court review of his conviction pursuant to 28 U.S.C. § 2254 must assert a violation of a federal constitutional right."); *see also Weeks v. Scott,* 55 F.3d 1059, 1063 (5th Cir. 1995) ("It is not our function as a federal appellate court in a habeas proceeding to review a state's interpretation of its own law.") (citing *Moreno v. Estelle,* 717 F.2d 171, 179 (5th Cir.1983)).

Batts is not entitled to habeas relief on this claim.  *Hughes v. Dretke*, 412 F.3d 582, 590 (5th Cir. 2005).

**VII.    The Claim of Uncorroborated Accomplice-Witness Testimony**

Batts alleges that the trial court erred in admitting uncorroborated testimony from an accomplice witness, Mehement Woldie, in violation of Texas law.  A federal habeas "may not consider the correctness of the evidentiary rulings of the Texas courts" under state law, but only "whether there has been a constitutional infraction of [petitioner's] due process rights which would render the trial as a whole 'fundamentally unfair.'"  *Holiday v. Stephens*, 587 F. App'x 767, 776 (5th Cir. 2014)  (quoting *Trussell v. Estelle,* 699 F.2d 256, 259 (5th Cir.1983)); *see also Johnson v. Puckett,* 176 F.3d 809, 820 (5th Cir. 1999) ("A state court's evidentiary rulings present cognizable

27

habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair.).

Batts's claim that the trial court failed to comply with a Texas state-law requirement that an accomplice's testimony be corroborated does not present a federal constitutional claim. There is no such requirement under federal law. *Brown v. Collins*, 937 F.2d 175, 182 n.12 (5th Cir. 1991); *see also United States v. Valdez*, 453 F.3d 252, 257 (5th Cir. 2006) (defendant may be found guilty based on the uncorroborated testimony of accomplice unless the accomplice's testimony is so incredible that he asserted facts he could not have observed or events that could not have happened in nature) (citing *United States v. Villegas-Rodriguez,* 171 F.3d 224, 228 (5th Cir.1999); *United States v. Bermea,* 30 F.3d 1539, 1552 (5th Cir.1994)).

The Fourteenth Court of Appeals addressed the issue of the accomplice's testimony and entered the following findings and conclusions:

> In his fourth issue, appellant contends that under the accomplice-witness rule, Woldie's accomplice testimony was not sufficiently corroborated to support appellant's conviction. It is well established that a conviction based upon the testimony of an accomplice must be sufficiently corroborated by other non-accomplice evidence. Tex. Code Crim. Proc. art. 38.14. As a co-indictee, Woldie is an accomplice as a matter of law. *See Burns v. State,* 703 S.W.2d 649, 651 (Tex. Crim. App.1985); *Nolley v. State,* 5 S.W.3d 850, 853 (Tex. App.-Houston [14th Dist.] 1999, no pet.). Therefore, Woldie's testimony must be corroborated by other non-accomplice evidence connecting appellant to the crime. Tex. Code Crim. Proc. art. 38.14; *Malone v. State,* 253 S.W.3d 253, 257 (Tex. Crim. App.2008).

> In our review, we eliminate all accomplice testimony from consideration and examine the remaining portions of the record for any non-accomplice evidence tending to connect appellant with the commission of the crime. *Malone,* 253 S.W.3d at 257. The corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself. *Id.* The evidence must simply link the accused in some way to the commission of the crime and show that

rational jurors could conclude that this evidence sufficiently tended to connect the accused to the offense. *Hernandez v. State,* 939 S.W.2d 173, 179 (Tex. Crim. App.1997). Because no precise rule can be formulated regarding the amount of evidence required to sufficiently corroborate the testimony of an accomplice witness, each case must be decided upon its own facts and circumstances. *Dowthitt v. State,* 931 S.W.2d 244, 249 (Tex. Crim. App.1996).

In determining whether evidence tends to connect a defendant to the offense, we must view the corroborating evidence in the light most favorable to the jury's verdict. *Brown v. State,* 270 S.W.3d 564, 567 (Tex. Crim. App.2008); *Gill v. State,* 873 S.W.2d 45, 48 (Tex. Crim. App.1994). If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, the requirement of article 38.14 has been fulfilled. *Cathay v. State,* 992 S.W.2d 460, 462 (Tex. Crim. App.1999); *Delacruz v. State,* 278 S.W.3d 483, 487 (Tex.App.-Houston [14th Dist.] 2009, pet. ref'd). Thus, for the conviction to rest upon Woldie's testimony, there must simply be *some* non-accomplice evidence which tends to connect appellant to the commission of the offense alleged in the indictment. *See Brown,* 270 S.W.3d at 567 (quoting *McDuff v. State,* 939 S.W.2d 607, 613 (Tex. Crim. App.1997)).

Woldie testified that appellant hired her as a loan processor at AMTHC during the relevant time period and briefed her on the company's real estate business operations. Woldie testified that appellant owned AMTHC, and through his business, appellant organized and operated a fraudulent real estate scheme. Woldie testified that appellant created and submitted false loan and closing documents to obtain fully funded mortgage loans from WMC. She further testified that the false written statements in the loan and closing documents were either made by appellant or made at his instruction. Woldie also testified that appellant compensated other participants in the scheme for their role in the combination.

Appellant argues that Woldie's accomplice testimony was the only evidence linking him to the crime and was not corroborated by other non-accomplice evidence. Appellant contends that the remaining non-accomplice evidence reflects only the existence of a mortgage fraud scheme, but falls short of connecting him to the combination. We disagree. Contrary to appellant's contention, the State offered substantial non-accomplice evidence that sufficiently corroborates Woldie's testimony. Specifically, the State introduced documentary

29

and testimonial evidence that Dual Access and AMTHC were appellant's companies and that he committed the fraudulent scheme through the two companies. Ransome, Askew, and Nicholson testified that appellant represented himself as the owner and president of the investment company. A business card was also introduced reflecting that appellant was the president of the company. The State further introduced the loan and closing documents implicating AMTHC as an active participant in making false written statements to WMC to obtain mortgage loans. These documents falsely reflected that AMTHC had the authority from the original sellers to convey the properties to the straw buyers. Moreover, Ransome, Askew, and Nicholson testified that appellant recruited them to "invest" in the underlying real estate and promised financial rewards. The State also introduced checks signed by appellant, drawn on the AMTHC bank account, payable to his co-defendants, to the straw buyers, and to others for their roles in the combination. Some of these checks were issued for earnest-money deposits and for subsequent mortgage payments on the properties.

The documentary evidence, coupled with the testimony of Ransome, Askew, and Nicholson, demonstrated that appellant: (1) owned AMTHC, the company through which the fraudulent scheme was carried out, (2) personally recruited many of the straw buyers who participated in the real estate transactions, (3) authorized funds to be paid to the straw buyers and his co-defendants, and (4) signed mortgage-payment checks and earnest-money checks relating to the real estate in the underlying fraudulent transactions. Viewing the corroborating evidence in the light most favorable to the verdict, it was reasonable for jurors to conclude that the non-accomplice evidence tended to connect appellant to the commission of the offense. Accordingly, we overrule appellant's fourth issue.

*Batts*, 302 S.W.3d at 432-434.

The Texas Court of Criminal Appeals accepted the decision of the Fourteenth Court of Appeals. The presumption that the state court followed "clearly established federal law" applies, subject to review to determine whether the decision was "contrary to" or "an unreasonable application of" federal law. *Jordan v. Dretke*, 416 F.3d 363, 367 (5th Cir. 2005). The Court of Appeals found documentary evidence as well as testimony linking Batts to the fraudulent scheme.

30

*Batts*, 302 S.W.3d at 434.  Batts fails to identify or present "clear and convincing evidence" to rebut the state court's factual findings or show that it was an objectively unreasonable application of Supreme Court precedent.  28 U.S.C. § 2254(d), (e)(1).  Batts is not entitled to habeas relief on his claim that court erred in admitting uncorroborated testimony  from an accomplice witness.

## VIII.   Conclusion

The respondent's motion for summary judgment, (Docket Entry No. 19), is granted.  Frederick Jordan Batts's petition for a writ of habeas corpus is denied.  This case is dismissed.  Any remaining pending motions are denied as moot.

Under the AEDPA, a petitioner must obtain a certificate of appealability from a district court's denial of habeas relief before appealing that denial.  28 U.S.C. § 2253(c)(2).  "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'" *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (citing 28 U.S.C. § 2253(c)(1)).  A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further."  *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (citation and internal quotation marks omitted).  "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Miller-El v. Cockrell*, 537 U.S. at 336.  Rather, "'[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Id*. at 338 (citing *Slack v. McDaniel*, 529 U.S. 473, 484).

A district court may deny a certificate of appealability on its own, without requiring further briefing or argument.  *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000).  The court finds that Batts has not made "a substantial showing of the denial of a constitutional right" and will not issue a certificate of appealability.

SIGNED on March 31, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge